**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No.   21-cr-0722 (JMC)** |
| **RAFEAL RONDON** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Mr. Rondon was only 22-years-old when he went to Washington, D.C. with his mother on January 6, 2021, bringing no weapons or protective gear. Rather, he wore casual clothing, blue jeans, a plaid shirt, and a backpack. They both responded to the chance to hear the former President Donald Trump speak at a rally that he implored people to attend. Prior to January 6, 2021, Mr. Rondon had no criminal history.

Despite Mr. Rondon's young age, he has already faced significant adversity. When he was only 19-years-old, Mr. Rondon accidentally fell off of a six-story building landing on cement. After being revived by medical professionals, Mr. Rondon suffered severe injuries that left him with unimaginable damage to multiple organs and bones.  Mr. Rondon understandably suffered from immense pain, underwent approximately 27 surgeries, and had to undergo extensive physical therapy for this injury. He has not yet made a full recovery. While all of his other friends were attending college and dating, Mr. Rondon was undergoing significant physical rehabilitation and parts of his body, including his jaw, were disfigured.

Also due to this horrific trauma at such a young age, Mr. Rondon fell into deep depression and was isolated from his peers - which was only heightened during the COVID-19 Pandemic.

Having nothing but time and pain during his period of depression, Mr. Rondon became intensely interested in the politics surrounding the 2020 Presidential Election - - he had not previously been very interested in such issues. Unfortunately, he was also soaking in the constant messaging and propaganda from groups who knew exactly who they were targeting – young men like Mr. Rondon.

The government's request of 51 months' incarceration is excessive and ignores how Mr. Rondon's young age, mental health, and previous trauma has undoubtedly contributed to this offense. The government also ignores the fact that he still has 14 months' incarceration to serve for a regulatory offense uncovered during the search warrant execution for the instant matter.

Since shortly after January 6, 2021, Mr. Rondon has truly distanced himself from the events and has done nothing but try to rebuild his life while completing a welding program that will hopefully give him bright career opportunities. He not only regrets his actions deeply and sincerely, he regrets disappointing his family. Mr. Rondon has done exceptionally well while on pre-trial supervision and United States Probation has even noted in its recommendation that it does not believe he poses a safety concern to the community. *See* ECF No. 76 at 3.

When looking at his specific conduct on January 6, 2021, and the rest of the 3553(a) factors, as well as the 14 month sentence he still has to serve, a lengthy

period of incarceration as the government suggests is not warranted. Based on a thorough consideration of each sentencing factor, Mr. Rondon respectfully requests that the Court impose a sentence of probation with the condition that he serve 6 months' home detention following the service of his 14 month prison sentence.

## BACKGROUND

On December 8, 2022, Mr. Rondon entered a guilty plea to one count of Obstruction of an Official Proceeding in violation of 18 USC §1512(c)(2) for his participation in the events on January 6, 2021. Prior to January 6, 2021, the former President Donald Trump convinced ordinary Americans, like Mr. Rondon, who were not experts in election law, that irregularities existed in the voting practices and that the fraud would be uncovered. He held rallies all over the country, repeating these claims and firing up his base of followers.

So, when the former President invited millions of his supporters to travel to D.C. on the same day as the electoral certification, he gave them false hope that their voices could somehow *legally* change the electoral certification results and that they could encourage Vice President Pence and other Republican leaders to reject the votes from states that had claimed voter fraud. What they did not know, however, is that the Electoral College Vote is mostly a ceremonial proceeding where Mr. Pence did not have the constitutional authority to reject the votes. Yet, powerful politicians were spreading messages to the contrary – including ones that would be in Congress to object that day. Below are examples of some of the political rhetoric that was spreading through the Trump supporter community prior to January 6,

2021, that came directly from former President Trump:

WE HAVE JUST BEGUN TO FIGHT!!! – **Tweet from Trump on December 12, 2022**.[1]

A great report by Peter. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild! – **Tweet from Trump on December 19**.[2]

The Justice Department and the FBI have done nothing about the 2020 Presidential Election Voter Fraud, the biggest SCAM in our nation's history, despite overwhelming evidence. They should be ashamed. History will remember. Never give up. See everyone in D.C. on January 6th.[3] – **Trump tweet from December 26, 2022**.

If you are planning to attend peaceful protests in D.C. on the 6th, I recommend wearing a body camera. The more video angles of that day the better. – **retweet by Trump on January 3, 2022**.[4]

If the liberal Democrats take the Senate and the White House – and they're not taking this White House – we're going to fight like hell, I'll tell you right now,"…We're going to take it back." – **Trump's words at a rally in Georgia on January 4, 2021.**[5]

If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect and even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back! - **Tweet from former President Trump at 1:00 am on January 6, 2021.**[6]

So, on January 6, 2021, Mr. Rondon attended the "Save America" rally with

his mother where he listened to several speeches encouraging the crowd to march to

---

[1] Sherman, Amy, *A Timeline of what Trump said before Jan. 6 Capitol riot*, Politifact, The Poyner Insttitute, January 11, 2021, available at
https://www.politifact.com/article/2021/jan/11/timeline-what-trump-said-jan-6-capitol-riot/
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *January 6 Report* at 61.

the Capitol to "stand up for this country and stand up for what is right.[7]" The

Former President Trump, after several minutes of reiterating his claims that the

election was stolen, said the following to the crowd (including Mr. Rondon) on

January 6, 2021:

> We will not let them silence your voices. We're not going to let it happen, I'm not going to let it happen…..We're gathered together in the heart of our nation's capital for one very, very basic and simple reason – to save our democracy….Now, it is up to Congress to confront this egregious assault on our democracy. And after this, ***we're going to walk down, and I'll be there with you***, we're going to walk down…I know that everyone here will soon be marching over to the *Capitol building* to peacefully and patriotically make your voices heard….And they want to recertify their votes…**But the only way that can happen is if Mike Pence agrees to send it back…If not…you will have an illegitimate President.** That's what you'll have. And we can't let that happen…**We must stop the steal** and then we must ensure that such outrageous election fraud never happens again….**And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore…..So we're going to, we're going to walk down Pennsylvania Avenue…And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that they need to take back our country.. So let's walk down Pennsylvania Ave**.[8]

Even as the Capitol building was getting ravaged by a crowd with no leader,

former President Trump did and said nothing for hours.[9] The only thing he did

---

[7] *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

[8] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot (last viewed on Nov. 22, 2022). (emphases added).

[9] Jonathan Allen, *On Jan. 6, Trump ignored all pleas to call off the mob attacking the Capitol while 'pouring gasoline on fire' aide says*, NBC News, July 21, 2022, available at

during the crucial hours of the attack was post a Tweet at 2:24 p.m. saying "Mike Pence didn't have the courage to do what should have been done to protect our country and our Constitution."[10]

## ARGUMENT

### I.    Legal Standard

The Court is well aware of the Supreme Court's opinions in *Kimbrough v. United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007). While courts must continue to consider the sentencing guidelines, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a).[11]  As the Supreme Court made clear in *Kimbrough* and *Gall*, the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. §3553(a).

---

https://www.nbcnews.com/politics/congress/prime-time-jan-6-hearing-focuses-trumps-inaction-187-minutes-mayhem-rcna36737

[10] Ewan Palmer, *Donald Trump Tweeted Attack on Mike Pence Minutes After Hearing VP Was Fleeing Capitol Rioters*, Newsweek, February 11, 2021 available at https://www.newsweek.com/donald-trump-tweeted-attack-mike-pence-minutes-capitol-rioters-1568568. (last viewed on November 29, 2022).

[11] Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. §3553(a).

In two more summary reversals, the Court further clarified that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors. *Nelson v. United States*, 555 U.S. 350 (2009); *Spears v. United States*, 555 U.S. 261 (2009). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson*, 555 U.S. at 352. In other words, a sentencing court may not rely on the Sentencing Guidelines range as a default to be imposed unless a basis exists to impose a sentence inside that range. Rather, the court must weigh each of the factors and impose a sentence that constitutes the least amount of imprisonment necessary pursuant to Section 3553(a).

## II.   Imposing a Variant Sentence is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).

### a.  Mr. Rondon's Personal History and Characteristics

Mr. Rondon is now 25-years-old and was born and raised in Watertown, New York by two parents who still reside together, along with his younger sister who is now 21-years-old. Both of Mr. Rondon's parents co-own a company called Regional Medical Management, which is designed to provide various services to the Upstate New York medical community. Mr. Rondon has a close relationship not only with his immediate family but also extended family that live in New York and Ohio.

Mr. Rondon had a typical childhood in a middle-class family. He excelled in school, receiving honors in high school. Because of his academic success, Mr. Rondon was accepted into a pre-pharmacy program at the University of Buffalo when he was 17-years-old. After high school graduation, he moved to Buffalo to

attend the University. Mr. Rondon spent two years at the University of Buffalo and then realized this career path was not for him. To take some time to figure out what he wanted to do instead, Mr. Rondon moved to New York City. It was there that his life would change forever in just one split second.

On May 16, 2019, when Mr. Rondon was only 19-years-old, he went to the rooftop of a six-story building to smoke a cigarette. As he was going up the fire escape landing, he tripped and fell off of the building – landing on the cement. It was a miracle that Mr. Rondon survived. Emergency Medical Services (EMS) responded and revived him after he went into cardiac arrest. *See* Exhibit 1, Medical Records (filed under seal). Mr. Rondon was rushed into surgery at Bellevue Hospital Center to treat a splenic laceration, multiple fractures, and traumatic respiratory arrest. *Id*. Mr. Rondon survived this extensive surgery but would have to be hospitalized for an entire month to surgically repair more injuries, including an almost shattered jaw and fractures to the left side of his pelvis. *Id*.

After multiple surgeries, Mr. Rondon was brought to a rehabilitation center in Yonkers, New York where he remained for approximately one month. When he was released, he returned home to his parents' house in Watertown where they helped him recover until 2022. Mr. Rondon still suffers from chronic pain in his knee and hip but he has learned to manage his pain without taking pain medications.

Despite this traumatic and life changing event, Mr. Rondon worked extremely hard to rehabilitate and to overcome the challenges of recovering. Family

and friends describe in detail how he overcame his injuries with determination. *See* Exhibit 2, Letters of Support. Eric Gibbs, his longtime friend, said that Mr. Rondon "refused to succumb to the pain, doubt, and anger he felt and day by day he rehabilitated himself both mentally and physically." *Id*. Another friend, Jacob Favret, explained: "There were many times it was obvious that Rafael was in immense pain but never once let us know it. He is truly unstoppable when he decided he is going to accomplish something." *Id*.

Unfortunately, in 2020, in the last stretch of his recovery, the COVID-19 pandemic hit. After being isolated from normal life even prior to the pandemic, Mr. Rondon would have to endure another two years of social distancing. He fell into a deep depression as a result of his isolation and because of the self-esteem issues due to his physical disfigurements. Politics became his outlet. Unfortunately, the pandemic and advancement of YouTube and other platforms created a world in which any person sitting behind their phone screen could be the mouthpiece for all social justice issues or political campaign agendas. This empowered the public to be actively involved in all current issues, regardless of reliance on facts, evidence, or good sources of information.

It is likely that if this accident had not happened, Mr. Rondon would have been working or going to school on January 6, 2021, and would not have ever been in Washington, D.C.

### b. Nature and Circumstances of the Offense

When Mr. Rondon decided to attend the rally in D.C. on January 6, 2021, he was not part of any organized group, did not engage in any pre-planning, and was with his mother. Mr. Rondon believed all of the mass messaging and propaganda that the election was stolen from him. He felt personally invited by the President of the United States to come to Washington, D.C. to hear him speak. Mr. Rondon attended the rally and heard Republican leaders, including Former President Trump, encourage the crowd to make their voices be heard so that an illegitimate President did not get elected. Former President Trump himself encouraged the crowd to go down to the Capitol building and assured them that he would join them there.[12]

After the rally, Mr. Rondon and his mother went to the Capitol building and followed the large crowd who had already walked into the Senate Wing Door. They entered at approximately 2:23 pm at a time when there was no resistance from law enforcement in that location. At no time did Mr. Rondon confront police officers, curse at them, or have any negative interactions with them. Immaturely, Mr. Rondon followed his mother into Nancy Pelosi's office where many other rioters were encouraging someone to steal a laptop sitting on a conference table. Mr. Rondon admitted later to the FBI in a voluntary interview conducted approximately 6 months after January 6, that his actions while inside this office were "stupid."

---

[12] According to testimony from the House of Representatives January 6th Committee, Former President Trump tried to go to the Capitol building after the rally but was re-directed by his security staff. *See* Gerrad Kaonga, What Donald Trump Limo Video on Jan. 6 Reveals, Newsweek (June 29, 2022) available at https://www.newsweek.com/donald-trump-presidential-limo-capitol-january-6-committee-cassidy-hutchinson-1720126 (last viewed November 30, 2022).

Oddly, he allegedly told the FBI that he helped the laptop thief: "I assisted him a little bit.[13]" Notably, the video evidence does not support Mr. Rondon physically doing anything to assist the laptop thief as the government acknowledges in its memorandum. Rather, Mr. Rondon was standing across from the laptop thief where his hands were visible and it is clear he is not helping to disconnect cables and he is not helping to place the laptop in his bag. Mr. Rondon voluntarily spoke to the FBI without an attorney present. It was one of the most stressful events of his life to be interviewed by the FBI at the same time that his residence was being searched. It is possible he did not remember all of the details of his conduct. Then after going to the Rotunda, Mr. Rondon and his mother made their way to the Senate Chamber where many other individuals were at this point. Mr. Rondon had no understanding that this was the Senate Chamber where Congress sat prior to entering. Mr. Rondon did not meet any police resistance while inside the Chamber for just a few minutes. On their way out, in the hallway, Mr. Rondon and his mother noticed a man who was giving out duffle bags with the escape hoods inside and they each took one, as there had been tear gas in the area. Mr. Rondon regrets his actions and clearly did not understand the gravity of what he was doing while with his mother inside the Capitol building. Both of them left the building shortly after. They were not pushed out by police but rather found a way out voluntarily.

---

[13] After listening to the audio recording of this interview, in response to being asked how he helped the laptop thief, Mr. Rondon says he "*thinks* he helped push the bag into his laptop" after being afraid about the man's aggressiveness - but is clear that he did not help disconnect the cables because the man "just ripped it right out of the wall."

Young men like Mr. Rondon were not only pawns of the Trump campaign, but more organized groups on January 6, 2021, like the Proud Boys, also intended to rile up normal people in the crowd to serve their agenda. The New York Times investigated this dynamic and learned that there were different groups who went to the Capitol building, ones that simply intended to protest peacefully and others with a plan to incite the crowd and breach the building.[14] The Proud Boys called people like Mr. Rondon "normies" and had an intent to rile them up in order to support their agenda.[15] Mr. Rondon went to DC naively, completely unaware of the powers that be that had paved the way for the perfect storm of January 6. He was used to serve a purpose and is now a felon because of it. While this does not excuse his actions, it does provide context. In the sentencing of Andrew Cavanaugh, the Judge Mehta opined that perhaps some J6 defendants are victims too and were ordinary Americans with no criminal history who were subject to the "power of being told lies over and over again by leaders who knew better." *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 26-27.

Furthermore, Mr. Rondon's young age should be considered when evaluating the nature and circumstances of the offense. Although this matter resolved pursuant to a plea agreement where the defense cannot request a

---

[14] New York Times, Proud Boys Led Major Breaches on Jan. 6 Video, July 11, 2022, available at https://www.nytimes.com/2022/07/12/us/politics/proud-boys-jan-6.html (last viewed on April 7, 2023).
[15] Reneau, Natalie, New York Times, How the Proud Boys Breached the Capitol on Jan. 6: Rile up the Normies, June 17, 2022, available at https://www.nytimes.com/video/us/politics/100000008392796/rile-up-the-normies-how-proud-boys-breached-the-capitol.html

downward departure, Mr. Rondon is allowed to request that the Court consider, as a variance, Mr. Rondon's young age for the same reasons laid out in U.S.S.G. §5K2.0. This variance recognizes that youthful age and lack of education are a sentencing consideration when those factors are present to an exceptional degree. *Id.* Here, Mr. Rondon was only 22-years-old when he went to the Capitol with his mother and was of course influenced by the older individuals who were there.

One of the seminal Supreme Court cases, *Gall v. U.S.* 128 S. Ct. (2007), involves a defendant who was also only 21-years-old and was invited by someone else to join in a conspiracy to distribute ecstasy. Gall's guideline range was 30-37 months but he ultimately received a period of probation at sentencing. The Supreme Court affirmed this sentence stating, "Immaturity at the time of the offense conduct is not an inconsequential consideration." *Id.* at 601-602. The Supreme Court further reasoned that recent studies on the development of the human brain conclude that brain development may not become complete until the age of twenty-five. *Id.* The Supreme Court also discussed how youth is a time and condition in life when a person may be most susceptible to influence. *Id.* See also *Miller vs. Alabama*, 567 U.S. 460 (2012) (Breyer, J., Sotomayor, J. concurrence).

Mr. Rondon's young age undoubtedly led him to be vulnerable to older and more powerful people who he trusted and believed would not steer him in a bad path. Being only 22-years-old at the time, without a college degree, and without

much knowledge on how the Electoral Count Act worked, Mr. Rondon fell into the manipulation strategies that Trump used to convince even older and more educated people that their democracy was being compromised. Young men like Mr. Rondon had no chance of understanding their role as pawns in the campaign's agenda that convinced people that Trump was actually the winner of the election. For this reason, Mr. Rondon should not be treated as harshly as someone older and with more experience. In addition, his young age undoubtedly had an impact in the Capitol building as he was watching older people, including his mom, and following their lead.

Furthermore, the power of social media on young individuals is astonishing and is something to which the older generation (including undersigned counsel) simply cannot relate. To truly understand the addictive power of social media, scientists have studied the effects on the brains of adolescents and found devastating impacts, including significant differences in brain chemistry.[16] Mr. Rondon has grown up in the social media world and was inundated with powerful messaging while in isolation recovering from his injuries. As such, he has been more vulnerable and is part of the target population of propaganda being spread by mass amounts of social media messaging.

Lastly, many courts have considered youthful age as well as a lack of criminal history and strong family support in imposing sentences far below

---

[16] CBS News, *NIH Study Tracks Effects of Social Media on Adolescent Brains*, Dec. 10, 2018, available at https://www.cbsnews.com/video/nih-study-tracks-effects-of-social-media-on-adolescent-brains/ (last viewed on October 5, 2023).

the sentencing guidelines. *See United States v. Ross*, 557 F.3d 237 (5th Cir. 2009) (sentence reasonable based on defendant's lack of criminal history, strong family support, and youth as mitigating factors); *United States v. Polito*, 215 Fed. Appx. 354, 357 (5th Cir. 2007) (upholding sentence due to young age and immaturity at time of offense that "prohibited him from acting rationally.") For these reasons, Mr. Rondon requests that the Court consider his youthful age, lack of education, susceptibility to influence, immaturity, and strong family support to conclude that these factors are present to an exceptional degree and thus a downward variance is appropriate.

After January 6, 2021, Mr. Rondon was cooperative with law enforcement and even participated in a voluntary interview with the FBI without a lawyer present.[17] He admitted to his conduct and even admitted to things that law enforcement likely would not have uncovered in their own investigation but for his statements. Mr. Rondon also made some immature comments during this interview that the government highlights in its sentencing memorandum. Rather than acknowledge the fact that Mr. Rondon admitted to his conduct early when he had no obligation to and had no counsel present, the government takes advantage of a young man's uncounseled statements to the FBI by highlighting it as an aggravating

---

[17] Mr. Rondon stated at the start of this interview that "he was uncomfortable discussing January 6" with law enforcement that morning. After agents encouraged him to speak to them, he spoke about his actions for several minutes providing specific details to law enforcement including his password to his electronic devices. At various points during this interview, it was apparent that Mr. Rondon was under an immense amount of stress.

factor in support of a higher sentence. That argument is disingenuous, especially after so many past January 6 cases where the government makes it a point to claim a defendant lacks remorse when they do not speak with the FBI and admit their conduct prior to being charged and convicted. Now Mr. Rondon does exactly that -- yet the government still picks apart his voluntary interview and admissions that actually assisted the government's investigation.

Furthermore, Mr. Rondon cooperated with the execution of a search warrant issued in the instant matter. As a result of that search, an old unregistered short-barreled shotgun was found in his residence. As a result, he was charged and convicted (while this matter was pending) of Possession of a Short Barreled Unregistered Firearm in violation of 26 U.S.C. § 5861(d). Mr. Rondon was sentenced in the Northern District of New York (NDNY) to 14 months' imprisonment as a first time offender convicted of a regulatory gun offense. *See United States v. Rafael Rondon*, Case No. 5:21-00329 (FJS). It is not uncommon for individuals, especially in Upstate New York, to have firearms to protect their homes from potential intruders given the remote location. However, Mr. Rondon accepted responsibility for that offense because the current law prohibits possession of unregistered firearms. Mr. Rondon has to self-surrender to the Marshals in D.C. to serve his 14 month sentence for this offense right after he is sentenced in this matter.

In addition to his cooperation with law enforcement and pre-trial services regarding his legal matters, Mr. Rondon has completely distanced himself from his conduct on January 6, 2021. Besides a couple of social media messages immediately following January 6, 2021, Mr. Rondon has ceased his online activity. He can be distinguished from the many January 6 defendants who continued to show a lack of remorse on social media while their criminal cases were pending. Rather, Mr. Rondon focused on his family and on his apprenticeship in welding that he has been committed to for some time now.

Thankfully, Mr. Rondon does have support from his family and friends as described in letters that they wrote to the Court that sentenced him earlier this year in the NDNY. *See* Exhibit 2, Letters of support. All describe him as a caring individual who cares very much for his family *Id*.

Mr. Rondon's father's cousin explains that Mr. Rondon has helped family members, including his maternal grandmother who is a widow. *Id* at 3-4. He wrote:

> Rafael would drive 30 minutes to her home to take her to her doctor appointments that were an hour away. He would cook for her, help clean the home and do chores that were needed to be completed around her home. Rafael shared a mutual admiration and love for his grandmother. *Id*.

Mr. Rondon's uncle wrote a letter explaining that "Rafael has always been a good son, grandson, and nephew within our small family…I love Rafael and hope you can understand how much he is needed." *Id.* at 6. Mr. Rondon's former welding instructor also provided insight to Mr. Rondon as a student he taught and explained:

I witnessed moments where [Rafael] struggled, so did others, and he took his experience to help other students study for exams, practice for weld tests, and generally build up morale. Rafael also volunteered to visit the local high schools with me to promote the welding program and share his journey. *Id.* at 9.

  **c.** **The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities**

Based on Mr. Rondon's success on pre-trial supervision for the past two years, the Court can be assured that it is unlikely he will repeat the same conduct. While on pre-trial release for this matter and his case in the NDNY, Mr. Rondon has done exceptionally well. He has not only complied with all of the terms of his pre-trial release, but also has rehabilitated even prior to being sentenced. While on release, Mr. Rondon pursued his career in welding. In March 2022, Rafael began a welding program at Indian River State College in Florida. He has since completed that program and is now certified in Welding Technology. *See* Exhibit 3, Vocational Certificate. After completing this program earlier this year, Mr. Rondon moved back to Upstate New York and began working full-time for Henderson Products Incorporated. Mr. Rondon resigned from this position recently knowing he would have to serve the sentence imposed in the NDNY. However, it is clear that Mr. Rondon was a productive member of society while on pre-trial supervision. *See United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (below guideline sentence imposed in part because of defendant's behavior while on pre-trial release); *United States v. Baker*, 502 F.3d 465 (6th Cir. 2007) (house arrest imposed rather

than incarceration in part because defendant behaved "exceedingly well" while under supervision).

Furthermore, Mr. Rondon already has 14 months' incarceration to serve for conduct stemming from a search warrant execution in this matter. As an initial matter, 14 months' incarceration for a young man with no criminal history for a regulatory firearms offense that is rarely charged is excessive.[18] Individuals convicted of this type of offense typically receive sentences of probation. *See United States v. Petika*, 2:16-CR-062 (EDVA) (defendant sentenced to 5 years' probation with 24 months home confinement for possession of 20 gauge shotgun shorted to 15.75 inches – advisory guideline range was 57-71 months); *United States v. Dalajah Teel*, 1:17-cr-139 (AJT) (young man sentenced to time served with 3 years' supervised release and 6 months home detention after defendant sold old antique short-barreled shotgun).

In addition, Mr. Rondon's physical condition and disfigurement puts him at greater risk during his incarceration. He also may need further medical treatment

---

[18] Furthermore, there are second amendment implications surrounding the regulation of sawed off shotguns in light of the landmark decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), which held that the District's handgun ban violated the Second Amendment in large part because its regulation extended the handgun ban to the home. In doing so, the Court acknowledged that certain restrictions – "presumptively lawful measures" – could be imposed. *Id*. at 626. The Court cautioned, however, that a statute with "the pretense of regulating, amounts to a destruction of the right to keep and bear arms…would be clearly unconstitutional." *Id*. at 629. Here, Mr. Rondon's Second Amendment right to possess firearms for self-defense in his home is arguably burdened by a regulation that furthers no substantial government interest. Justice Scalia observed that shorter firearms are ideal weapons of self-defense because they are easier to lift and aim. *Id*. at 625. In this case, Mr. Rondon clearly had this firearm for self-defense as it was in his home and was not there for any other purpose.

which is difficult to obtain. Sentencing him to an additional term of imprisonment will do nothing but exacerbate these problems. The "understaffing" in Bureau of Prisons' healthcare positions "limits inmate access to medical care." Review of the Federal Bureau of Prisons' Medical Staffing Challenges, Office of the Inspector General, U.S. Department of Justice, at 1 (March 2016). Unfortunately, "many institutions remain understaffed, limiting the amount of care that an institution can provide." *Id*. at 2. At some institutions, even for "basic medical care" inmates have to be sent "outside the institution. *Id*. at 16. The COVID-19 Pandemic has undoubtedly contributed to even more understaffing issues since 2016.

Lastly, the government is incorrect to suggest that the matter in the NDNY should be treated separately than this offense. The sawed off shotgun was only found as a result of the investigation in this matter – where Mr. Rondon actually *led* the FBI to the exact location of the sawed off piece of the shotgun. *See United States v. Rafael Rondon*, 5:21-cr-00329 (FJS), Gov. Sentencing Memo. Had this offense been charged in this jurisdiction rather than in New York, the Court would have easily been able to treat the two matters as one sentence taking into account all of the circumstances. It is for this reason that this 14 month sentence is more than sufficient to accomplish the goals of sentencing for both matters.

Although there are no cases that are identical, a review of past January 6 sentences imposed for other defendants convicted of 18 U.S.C. §1512(c)(2) further demonstrates that a significant variance is warranted in the instant case.

• *US v. Matthew Wood*, 21-cr-223 (APM): After consideration of all of the sentencing factors, the court rejected the government's request for 57 months' incarceration and imposed a sentence of one year home confinement for a defendant who was convicted of 18 U.S.C. §1512(c)(2). Similarly, in *Wood*, the government argued that an 8 level enhancement for "causing or threatening to cause injury" should apply – however the Court rejected this argument and found the proper guideline range to be 21-27 months. Mr. Wood was also a young man, being 23-years-old and also falling victim to the same manipulation strategies of former President Trump and company. Similarly, Mr. Wood entered sensitive areas in the Capitol building. While Mr. Wood did not steal anything, there were other aggravating factors not present in this case. Both defendants accepted responsibility and entered a guilty plea.

• *US v. Richard Michetti,* 21-cr-232 (CRC): Defendant sentenced to 9 months' incarceration after pleading guilty to 18 U.S.C. §1512(c)(2). Mr. Michetti's sentencing guideline range was 15-21 months. The government accused Mr. Michetti of yelling at police while they were being assaulted by others – calling them "fucking animals." The government also alleged that he briefly pinched the sleeve of another officer and continued to push against a police line in the Rotunda after being hit by chemical spray. While Mr. Michetti did not enter into sensitive areas, Mr. Rondon did not yell at or antagonize police. Mr. Rondon was also very cooperative post January 6.

• *US v. Paul Hodgkins,* 21-cr-188 (RDM): defendant sentenced to 8 months' incarceration after pleading guilty to 18 U.S.C. §1512(c)(2). Mr. Hodgkins was accused of entering the Senate Chamber as well, but unlike Mr. Rondon, Mr. Hodgkins brought a backpack containing protective eye goggles, rope, and white latex gloves.

• *United States v. Anthony Puma,* 21-cr-454 (PLF): Defendant received 9 months' incarceration. Mr. Puma was in his 50's and also behaved immaturely on January 6 based on significant influence from former President Trump. He stayed in the Capitol and on the grounds for several hours but was never violent. Mr. Puma entered a guilty plea and cooperated with law enforcement. Mr. Puma also had very strong family ties and support.

• *US v. John Andries,* 21-cr-93 (RC): Defendant sentenced to 12 months' and one day of incarceration after pleading guilty to 18 U.S.C. §1512(c)(2). The Court calculated his guideline range to be 21-27 months. Mr. Andries was right behind the first wave of rioters that breached the Senate Wing Door. He also made his way to the Speaker's Lobby and witnessed the shooting of Ashli Babbit. Mr. Andries recorded himself in the building, making some unfortunate comments. After he left the building, he had to be physically removed by law enforcement after refusing to leave. Mr. Andries also had two new arrests post Jan. 6. However, Mr. Andries had many mitigating factors, such as his outstanding service as a US Marine, and had mental and medical

conditions. Mr. Andries was also cooperative with law enforcement and very remorseful for his actions.

It is also worth highlighting other non-felony cases where a defendant's young age was a significant factor in the Court varying downwards. For example, in *United States v. Jacob Wiedrich*, 21-cr-581 (TFH), a sentence of 90 days' home detention was imposed. Mr. Wiedrich was only 21-years-old at the time. He was met with police resistance at the Senate Wing Door but proceeded inside following the older crowd and chanting at officers. He stole a U.S. flag from the Capitol building but the flag was later recovered from his home. Mr. Wiedrich also made some unfortunate comments post January 6. However, the Court acknowledged his young age, acceptance of responsibility, and success on pre-trial supervision when imposing his sentence. Furthermore, in *United States v. Christopher Ortiz*, 1:22-cr-082 (JMC), the Court imposed a sentence of 12 months' probation after a guilty plea to the petty misdemeanor, Parading and Picketing in a Capitol Building. Mr. Ortiz was 27-years-old when he went to the Capitol building and made his way to the lower west tunnel where the crowd was trying to force its way inside the building. However, the Court acknowledged his immaturity and his cooperation with law enforcement where he admitted to his conduct. Mr. Ortiz is still doing exceedingly well on supervision.

Lastly, in *United States v. Debra Maimone*, 21-cr-289 (RDM), the Court imposed a sentence of 24 months' probation after Ms. Maimone entered a plea of guilty to misdemeanor theft. Like Mr. Rondon, Ms. Maimone entered through the

Senate Wing Door at approximately the same time. Ms. Maimone also went to the Senate Gallery and stole an escape hood that was strapped under a Senate Gallery seat. Just like Mr. Rondon, Ms. Maimone's actions were foolish and impulsive – however they did not engage in any violent or threatening conduct. They both also accepted responsibility for their conduct.

### General Deterrence

Imposing a sentence of incarceration is not the way to ensure that the isolated events on January 6 will never occur again. An event like January 6 is unlikely to happen again[19] Even if it did, the public will not be deterred by a simple man from New York who is not an extremist. Empirical evidence proves that the certainty of prosecution, rather than the severity of the punishment is the greater deterrent.[20] Individuals like Mr. Rondon have already been deterred by this threat of prosecution, especially because most of them have not previously been exposed to the criminal justice system and prison sentences. Most individuals involved in January 6, 2021, were encouraged to do what they did by the most powerful executive in our country and yet the government has not hesitated to prosecute these individuals to the fullest extent possible. Incarceration with most of these cases is not the answer and perhaps to really effect general deterrence, something

---

[19] See transcript of video sentencing in *United States v. Douglas Sweet*, 21CR41-3 (Judge Nichols stated, "It is unlikely that the circumstances that led to their actions on January 6 will occur again. It is unlikely that the sitting President will invite them, as part of a large crowd, to protest and demonstrate, even fight at the Capitol. . . ").

[20] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

very different is needed so that individuals do not fall victim to the dangerous propaganda that incited January 6, 2021.

Judge Mehta alluded to this dilemma in a recent sentencing hearing encouraging us all to ask ourselves why ordinary American citizens from all over the country with good backgrounds, steady jobs, and often times even Veterans, came together to commit these acts. *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 26-28. Judge Mehta opined that this was able to occur because of:

> [T]he power of propaganda; the power of being told lies over and over and over again; told by leaders who knew better, that something was taken away from people when it wasn't…the idea that people who have otherwise led modest and humble lives, who have not been political agitators, political activists, are now facing serious jail time is extraordinary. *Id*.

## III.   The Government's Calculation of the Guidelines is Incorrect

The government is incorrect that an 8 level adjustment applies pursuant to U.S.S.G. § 2J1.2(b)(1)(B) for "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." It is undisputed that Mr. Rondon did not cause physical injury to a person, but he also did not cause property damage. Even if the government's argument is correct and "property damage" is somehow akin to "loss of use of property via stealing," this act still was not done *in order to* obstruct the administration of justice.

### a.  Mr. Rondon did not cause property damage

The government stretches credulity by suggesting that the plain language of the guidelines should mean something else. It argues that because there is a

dictionary definition that defines "damage" to include "loss of usefulness" that because Mr. Rondon stole something (and/or assisted in stealing) that the act of stealing deemed the property to be useless. Firstly, this reading would create an absurd result in that any defendant who stole anything – even a piece of paper – would be subject to an 8 level increase under the guidelines. Secondly, had the Sentencing Commission wanted to include theft in this particular enhancement – it would clearly have done so. Instead, it specifically explains that this enhancement is "designed to address cases in which *property damage* is caused or threatened as a means of intimidation or retaliation (e.g., to intimidate a witness from, or retaliate against a witness, for testifying). *See* U.S.S.G. § 2J1.2, Application Note 5. (emphasis added). Mr. Rondon did not destroy property and certainly did not steal as a means of intimidation or retaliation. The government's suggestion that an off-hand comment (that his mother made) to the thief of the laptop that "it would be interesting to know what's on that hard drive," is a far cry from "intimidation" or "retaliation" *of a witness*. The government then groups Mr. Rondon into a category of other January 6 defendants that stole and caused damage to offices speculating that the only conceivable purpose was to intimate or retaliate against Congress. This speculation is not sufficient to apply an 8 level adjustment where the language of the guidelines simply does not allow it. There are so many reasons that January 6 defendants stole and caused damage to offices, some of which include sheer stupidity and mob mentality. To suggest that every individual had some targeted goal that is not supported by specific evidence does not meet the "preponderance of

evidence" standard that is required in order to adjust 8 levels upward. The enhancement also clearly does not include stealing but requires actual damage to property – regardless of any intimidation factor. This enhancement simply is not applicable and the government cites no authority in support of its incredulous interpretations of the guidelines.

### b. Mr. Rondon did not steal in order to obstruct the administration of justice

Even if the government's argument is correct – which it is not – the government wrongfully assumes that the theft was *in order to* obstruct the administration of justice. Simply because the plea agreement stipulates that the overall conduct of going into the Capitol building and Senate Chamber had the effect of obstructing the administration of justice pursuant to U.S.S.G. § 2J1.2 (b)(1)(2), does not mean that every specific act of a defendant automatically also obstructs the administration of justice so as to justify *additional* enhancements based on a different factual requirement. *See United States v. Calvert*, 511 F.3d 1237, 1240 (9th Cir. 2008) (recognizing that 2J1.2(b)(1)(B) "only applies where the defendant acts with an intent to obstruct the administration of justice" and finding that defendant's intent to physically harm a witness in retaliation triggered the enhancement). Otherwise, the government's interpretation would lead to an absurd result - that anyone entering the Capitol who generally had the intent to obstruct and is therefore subject to both 2J1.2(b)(1)(2) and 2J1.2(b)(1)(B). This would nullify the existence of two separate enhancements that have two separate factual analyses.

27

Here, Mr. Rondon was with his mother when they traveled through the Capitol building. When they entered into Nancy Pelosi's office, they encountered an individual trying to steal a laptop. While other rioters were encouraging this person to steal the laptop, Mr. Rondon's mother says, "It would be interesting to know what's on that hard drive." Mr. Rondon's mom then provided gloves to this person at the person's request. Then, notably, while Mr. Rondon admits later on that he helped this person disconnect the laptop cable and put it in his backpack, the evidence does not support this admission as the government acknowledges. Counsel understands that this admission is also contained in the Statement of Offense, however the video evidence supports that another individual helped the laptop thief disconnect the cables. Then, as Mr. Rondon is leaving the Senate Chamber with the intention of exiting the building, Mr. Rondon and his mother take escape hoods and wear them out of the building.

Plainly put, it could not have been their intention to further obstruct justice with escape hoods when they clearly left the building immediately after. In an interview with the FBI, Mr. Rondon said he took the escape hoods "just in case he ran into a wall of smoke." Mr. Rondon's intention was obviously to protect himself on his way out of the building but his intention was not to use the escape hood to further obstruct justice because his intention was to leave immediately. In *United States v. Reid*, 21-cr-316 (DLF), the Court refused to apply this adjustment based on evidence that Mr. Reid damaged a TV and water cooler. Post January 6 messages posted by Mr. Reid showed his intent in doing those things was because, "he lost his

shit" but did not damage property in order to obstruct justice. Just like in *Reid*, the government would have a better argument here if Mr. Rondon wore the hoods prior to entering another area of the Capitol building where he intended on assaulting officers or engaging in confrontation. That would provide some nexus between the theft and the intent to obstruct justice. Here, we do not have that nexus and the Court should reject the government's speculation in order to add an enhancement that adds approximately four years of additional imprisonment to the guideline range.

For these reasons, 2J1.2(b)(1)(B) does not apply and the appropriate guideline range is the one provided by probation, which is 18-24 months.

## CONCLUSION

For the reasons stated above, Mr. Rondon respectfully requests that the Court impose a non-incarceration sentence to follow the 14 months' incarceration he must serve following the sentencing in this matter.  Mr. Rondon also requests that a fine not be imposed in light of the fact that he has a restitution obligation.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Maria N. Jacob
Assistant Federal Public Defender

625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org